624 A.2d 578

WILLIAM M. O'KEEFE, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. PASSAIC VALLEY WATER COMMISSION, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued November 10, 1992—Decided May 27, 1993.

*Harold Goldman* argued the cause for appellant and cross-respondent.

*Paul Schachter* argued the cause for respondent and cross-appellant (*Reinhardt & Schachter,* attorneys on behalf of the American Civil Liberties Union of New Jersey; *Mr. Schachter* and *Denise Reinhardt,* on the briefs).

*Robert A. Shire*, Deputy Attorney General, argued the cause for *amicus curiae*, Attorney General of New Jersey (*Robert J. Del Tufo*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal presents a challenge by respondent, William M. O'Keefe, to the drug-testing program of appellant, Passaic Valley Water Commission (PVWC). PVWC has a written policy that all applicants for employment must submit to a drug test and that it may refuse to hire any applicant who tests positive. O'Keefe asserts that PVWC refused to hire him as a water-meter reader because he would not take the test. He contends that the program is unconstitutional under both the Fourth Amendment of the United States Constitution and article one, paragraph seven of the New Jersey Constitution.

The Chancery Division held that PVWC refused to hire O'Keefe for reasons independent of his unwillingness to take the test. The trial court also concluded that the drug-testing program violated both the State and federal constitutions.

Finding that "the question of constitutionality need not have been reached at all," 253 *N.J.Super.* 569, 575, 602 *A.*2d 760 (1992), the Appellate Division affirmed both holdings. One judge dissented, rejecting the Chancery Division's finding that PVWC's refusal to hire had been based on grounds independent of O'Keefe's failure to submit to the drug test. *Id.* at 595, 602 *A.*2d 760. He also concluded that the drug-testing program did not violate either the State or the federal constitution, a conclusion that rendered moot PVWC's reasons for not hiring O'Keefe.

PVWC appealed as of right from the holding that its drug-testing program was unconstitutional. O'Keefe cross-appealed from the holding that PVWC had refused to hire him for reasons unrelated to his refusal to take the drug test. We hold

that adequate evidence supports the finding that PVWC had refused to hire O'Keefe for reasons unrelated to his refusal to take the drug test. That holding renders moot the issue of the constitutionality of the drug-testing program.

-I-

Before the events that gave rise to this action, O'Keefe had unsuccessfully applied for employment with PVWC as a meter reader. When considering his earlier application, John Galletta, PVWC's personnel director, had interviewed O'Keefe. Thereafter, in May 1987, PVWC adopted a policy requiring all applicants to submit to a drug test. The stated purpose of the policy was to decrease employee absenteeism and the health costs associated with illegal drug use, and to identify "stabl[e]" candidates.

Shortly after PVWC instituted the program, a meter-reader position became available. PVWC called O'Keefe for an interview. Galletta, joined by the foreman of PVWC's water-meter-reader department, once again interviewed O'Keefe. Several days later, PVWC asked O'Keefe to fill out various forms, including an IRS W-4 form, insurance forms, and an agreement to purchase safety shoes. O'Keefe also signed a drug-test consent form explaining PVWC's policy. The form read:

It is the policy of the Passaic Valley Water Commission to have all new employees submit to a drug test as part of their application for employment with the Commission.

I understand that as part of my pre-employment application with Passaic Valley Water Commission I will have to undergo a drug test at no cost or obligation to me by a doctor employed by the Commission.

I hereby agree that the taking of this drug test is voluntary on my part and that the results will remain confidential between the doctor, the Commission and myself.

I further understand and agree that should the results of said test prove positive, my application for employment with the Commission may be rejected.

Notwithstanding the above, I hereby agree to submit to said drug test voluntarily and of my own free will.

Without extending a job offer to O'Keefe, PVWC arranged for him to take a physical examination and drug test at the Niccollai Medical Center.

At the center, a nurse gave O'Keefe two small cups for urine samples, one for the routine physical examination and the other for the drug test. O'Keefe was to provide the samples without monitoring in a private bathroom. He provided the sample for the physical examination, but refused to provide one for the drug test. In response to an inquiry from a doctor, O'Keefe stated that he was taking medication because he was recovering from hepatitis and that he feared the medication would produce false positive results. The doctor assured O'Keefe that he could eliminate any such results if he knew the names of the medications. O'Keefe, who was taking tranquilizers, not medication for hepatitis, stated that he could not recall the medications.

On learning that O'Keefe had refused to provide a urine sample for the drug test, Galletta nevertheless asked the medical center to proceed with the physical examination. After the examination, O'Keefe called PVWC. In accordance with its standard practice when not offering employment to an applicant, PVWC failed to return his calls.

PVWC ultimately hired an applicant who had made a "better impression" on Galletta, despite scoring two points lower than O'Keefe on the Civil Service examination. During both interviews, according to Galletta, O'Keefe was "flippant," seemed like a "wise-guy," and had not truthfully answered all questions. In fact, Galletta stated that on the second interview he was just "going through the motions" to comply with Civil Service regulations.

O'Keefe sued, alleging that PVWC had not hired him because he had refused to submit a urine specimen for drug testing. In separate counts, O'Keefe asserted that the drug test (1) was unconstitutional because it violated his freedom from illegal searches and seizures under the Fourth Amendment to the

United States Constitution and article one, paragraph seven of the New Jersey Constitution; (2) violated his right to privacy under article one, paragraph one of the State Constitution; (3) was contrary to public policy of New Jersey; (4) violated the due-process guarantees of article one, paragraph one of the State Constitution, the Fourteenth Amendment to the United States Constitution, and 42 *U.S.C.* § 1983; and (5) was contrary to the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 to -42. He sought an injunction directing PVWC to hire him as a meter reader and preventing it from requiring any applicant or employee to submit to drug testing without a warrant or probable cause to believe that the applicant or employee was using unlawful drugs. In its answer, PVWC denied that O'Keefe "was not employed by it because of his refusal to take the drug test."

Before trial, the Chancery Division dismissed the fifth count of the complaint, which alleged a violation of the New Jersey Law Against Discrimination. After trial, the court rendered an opinion that declared unconstitutional PVWC's drug-testing policy but sustained its refusal to hire O'Keefe for independent reasons. In reviewing that opinion, the Appellate Division stated that the Chancery Division's conclusion that PVWC had refused to offer employment to O'Keefe was

> entitled to our deference since it is supported by adequate credible evidence. The linchpin of the trial judge's determination was the prior rejection of plaintiff's application for the civil service position of water meter reader by its Personnel Director, John Galletta, in the summer of 1986. That was before the Commission's adoption of its pre-employment drug-testing policy.

[253 *N.J.Super.* at 572, 602 *A.2d* 760 (citation omitted).]

After reviewing the evidence, the Appellate Division concluded that

> the trial judge found that Galletta declined to offer employment to plaintiff because of his justifiable belief that plaintiff "was not truthful," was a "wise guy," and had a "disrupting behavior pattern." It is true that the trial judge did note that plaintiff's refusal to take the drug test did play some part in the non-hiring decision. But as the judge explained, the non-hiring decision was not based on the refusal itself. Rather the circumstances of the refusal, including

plaintiff's uncommunicated change of mind after signing the waiver and his equivocation respecting his reasons for refusing to take the exam, merely reinforced Galletta's negative impressions respecting plaintiff's attitude and trustworthiness. The judge concluded, moreover, that those impressions, which he found to be reasonable and credible, constituted a valid and independent reason for the non-hiring. We are satisfied, particularly in view of the judge's expressed appraisal of the relative testimonial credibility of plaintiff and Galletta, that these findings and conclusions are adequately supported by the record and, consequently, require our deference.

[*Id.* at 573–74, 602 *A.*2d 760 (footnote omitted).]

Although not expressly noted by the Appellate Division, any ambiguity in the trial court's findings was put to rest by paragraph three of the judgment, which stated: "Plaintiff would not have been hired by defendant independent of his refusal to submit to the pre-employment drug test, and therefore he is not entitled to damages based upon defendant's failure to hire him as a water meter reader."

-II-

██ We agree with the Appellate Division that the record supports the Chancery Division's finding that PVWC's refusal to hire O'Keefe was for reasons unrelated to his failure to take the drug test. 253 *N.J.Super.* at 572–74, 602 *A.*2d 760. We also agree that such a finding renders moot the constitutional challenge to the drug-testing policy. *Id.* at 575, 602 *A.*2d 760. Having decided the case on non-constitutional grounds, we believe that the lower courts need not have adjudicated the constitutionality of PVWC's drug-testing policy. As we have previously explained, courts should not reach constitutional questions unless necessary to the disposition of the litigation. *E.g., Donadio v. Cunningham,* 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971) (citing *Ahto v. Weaver,* 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963)); *State v. Zucconi,* 50 *N.J.* 361, 364, 235 *A.*2d 193 (1967); *State v. Salerno,* 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958); *State v. Fair Lawn Serv. Ctr.,* 20 *N.J.* 468, 470–71, 120 *A.*2d 233 (1956) (citing *Michaelson v. Township of Wall,* 92 *N.J.L.* 72, 108 *A.*

145 (Sup.Ct.1918)); *Grobart v. Grobart,* 5 *N.J.* 161, 165, 74 *A.*2d 294 (1950).

This maxim, which has long been a part of our jurisprudence, see *State v. Corson,* 67 *N.J.L.* 178, 187, 50 *A.* 780 (Sup.Ct.1901), remains vibrant today. *See, e.g.,* John Paul Stevens, *The Bill of Rights: A Century of Progress,* 59 *U.Chi.L.Rev.* 13, 37 (1992) (stating that doctrine of judicial restraint obliges federal judges to avoid "unduly expansive constitutional adjudication") (citing John Paul Stevens, *Judicial Restraint,* 22 *San Diego L.Rev.* 437, 446 (1985)). It derives from the "policy of strict necessity in disposing of constitutional issues," *Rescue Army v. Municipal Court,* 331 *U.S.* 549, 568, 67 *S.Ct.* 1409, 1419, 91 *L.Ed.* 1666, 1678 (1947); *see also Burton v. United States,* 196 *U.S.* 283, 295, 25 *S.Ct.* 243, 245, 49 *L.Ed.* 482, 485–86 (1905) (stating that United States Supreme Court will not decide constitutional issue unless absolutely necessary to disposition of case), and "draws support from Chief Justice Marshall's rationale of judicial review as a reluctant power exercised only because the Court must decide cases brought before it in conformity with the Constitution." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law,* 2.13(g) at 240 (2d ed. 1992) (citing *Marbury v. Madison,* 5 *U.S.* (1 *Cranch* ) 137, 2 *L.Ed.* 60 (1803)). Consistent with this precept, the United States Supreme Court " 'avoid[s] passing upon a large part of all the constitutional questions pressed upon it for decision.' " *Rescue Army, supra,* 331 *U.S.* at 568–69, 67 *S.Ct.* at 1419, 91 *L.Ed.* at 1678 (citing *Ashwander v. Tennessee Valley Auth.,* 297 *U.S.* 288, 346, 56 *S.Ct.* 466, 482, 80 *L.Ed.* 688, 710 (Brandeis, J., concurring), *reh'g denied,* 297 *U.S.* 728, 56 *S.Ct.* 588, 80 *L.Ed.* 1011 (1936). See Laurence H. Tribe, *American Constitutional Law* § 3–8 at 71–72 (2d ed. 1988) (explaining that over time Supreme Court developed variety of means to avoid rendering decisions on most constitutional issues it encounters).

The policy considerations underlying the avoidance of constitutional questions are a respect for other branches and levels of government, an awareness of the limitations of judicial power,

sensitivity to the burdens of a constitutional adjudication, and appreciation that others may provide a more useful answer. See *Rescue Army, supra,* 331 *U.S.* at 571, 67 *S.Ct.* at 1421, 91 *L.Ed.* at 1679 (stating policy reasons for avoiding constitutional questions).

■■ The wisdom of not reaching for constitutional issues is made manifest by the problems that plague employment-related drug-testing cases. A drug test, whether administered by the government either for law-enforcement or employment purposes, is subject to the requirements of the Fourth Amendment. *Skinner v. Railway Labor Executives Ass'n,* 489 *U.S.* 602, 617, 109 *S.Ct.* 1402, 1413, 103 *L.Ed.*2d 639, 660 (1989); *National Treasury Employees Union v. Von Raab,* 489 *U.S.* 656, 665, 109 *S.Ct.* 1384, 1390, 103 *L.Ed.*2d 685, 701 (1989). An analysis of the Fourth Amendment to the United States Constitution or article one, paragraph seven of the New Jersey Constitution initially poses the question whether an employer has a "special ... need[ ] beyond the normal need for law enforcement" to test applicants. *Von Raab, supra,* 489 *U.S.* at 665, 109 *S.Ct.* at 1390–91, 103 *L.Ed.*2d at 702; *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661 (citing *Griffin v. Wisconsin,* 483 *U.S.* 868, 873–74, 107 *S.Ct.* 3164, 3168, 97 *L.Ed.*2d 709, 717 (1987)); *see also* Yale Kamisar, *The Fourth Amendment: The Right of the People to Be Secure in Their Persons, Homes, Papers, and Effects, in A Time for Choices* 31, 34 (Claudia A. Haskel & Jean H. Otto eds., 1991) (stating that for last twenty-five years United States Supreme Court has treated Fourth Amendment as flexible standard permitting balancing of public and private interests when government programs are directed at special problems beyond those of law enforcement). The federal courts have disagreed sharply on the definition of a "special need." *Compare Willner v. Thornburgh,* 928 *F.*2d 1185, 1190 (D.C.Cir.) (stating government's interest in operation of an office is special need), *cert. denied sub nom. Willner v. Barr,* ⸺ *U.S.* ⸺, 112 *S.Ct.* 669, 116 *L.Ed.*2d 760 (1991) *with Burka v. New York City Transit Auth.,* 739 *F.Supp.* 814

(S.D.N.Y.1990) (asserting special need is present only when drug-testing program is designed to prevent drug use by employees in "safety-sensitive" positions).

After determining whether a special need exists, a court must then balance the applicant's or employee's privacy interests against those of the government employer in administering the drug-testing program. *Von Raab, supra,* 489 *U.S.* at 665–66, 109 *S.Ct.* at 1390–91, 103 *L.Ed.*2d at 702; *Skinner, supra,* 489 *U.S.* at 619, 109 *S.Ct.* at 1414, 103 *L.Ed.*2d at 661. The present case raises the further problem of distinguishing between the privacy rights of applicants and those of employees. *Compare Willner, supra,* 928 *F.*2d at 1190 (finding distinction because applicants can preclude imposition of drug test by not applying for particular position and because denial of future employment not as intrusive as loss of existing job) *with* Jonathan V. Holtzman, *Applicant Testing for Drug Use: A Policy and Legal Inquiry,* 33 *Wm. & Mary L.Rev.* 47, 48–61 (1991) (arguing distinction between rights of applicants and employees devalues right of privacy).

Yet another question is whether the employer's procedures minimize the intrusiveness of the drug testing and diminish the employee's reasonable expectation of privacy in the drug test. *Compare Harmon v. Thornburgh,* 878 *F.*2d 484, 489 (D.C.Cir. 1989), *cert. denied sub nom. Bell v. Thornburgh,* 493 *U.S.* 1056, 110 *S.Ct.* 865, 107 *L.Ed.*2d 949 (1990) (distinguishing random drug-testing program from one limited to single pre-employment test) *with Transportation Inst. v. United States Coast Guard,* 727 *F.Supp.* 648, 654 (D.D.C.1989) (finding single pre-employment test diminishes employees' privacy interests); *International Fed'n of Professional & Technical Eng'rs, Local 194A v. Burlington County Bridge Comm'n,* 240 *N.J.Super.* 9, 17, 572 *A.*2d 204 (App.Div.) (stating drug testing during routine physical examination less objectionable than random drug testing), *certif. denied,* 122 *N.J.* 183, 584 *A.*2d 244 (1990).

Beyond that, we would be compelled to consider the significance of an employee's notice of the drug-testing requirement. *See generally Von Raab, supra,* 489 *U.S.* at 672 n. 2, 109 *S.Ct.* at 1394 n. 2, 103 *L.Ed.*2d at 706 n. 2. (finding intrusiveness of drug testing in Customs Service significantly minimized by combination of advance notice provided to applicant for promotion, ability of applicant to provide urine sample without direct observation in private stall, restriction that sample may be examined only for specified illegal drugs, and rule that applicant need not disclose personal medical information to government employer unless test result is positive); *Willner, supra,* 928 *F.*2d at 1190 (finding advance notice of drug-testing program minimizes any unsettling show of authority by employer). *But see* Anthony Amsterdam, *Perspectives on the Fourth Amendment,* 58 *Minn.L.Rev.* 349, 384 (1974) (stating notice does not necessarily prevent government conduct from being unreasonable). Still another consideration is the relevance of drug testing in the private sector as indicative of a reasonable infringement on expectations of privacy. *Compare Willner, supra,* 928 *F.*2d at 1191 (finding practices of private industry are factor) *with Georgia Ass'n of Educators v. Harris,* 749 *F.Supp.* 1110, 1115 (N.D.Ga.1990) (stating private-industry practice irrelevant).

With applicants, as distinguished from employees, the requirement of individualized suspicion raises a further problem because of the employer's inability to observe applicants in an office setting. See *Von Raab, supra,* 489 *U.S.* at 674, 109 *S.Ct.* at 1395, 103 *L.Ed.*2d at 707; *Harmon, supra,* 878 *F.*2d at 489. In the present case, another consideration would be whether the position of a water-meter reader is "safety-sensitive." *See O'Keefe, supra,* 253 *N.J.Super.* at 577, 602 *A.*2d 760. Finally, we would have to consider the relevance of economic considerations, such as PVWC's justification of the drug-testing program to decrease employee absenteeism and stabilize its work force. *See Georgia Ass'n of Educators, supra,* 749 *F.Supp.* at 1115 (finding mere generalized interest

in integrity of work force insufficient to overcome employee's privacy interests).

As the preceding considerations illustrate, "the complex issues of drug-testing in the workplace are better addressed in the contexts of legislative action or labor-relations agreements." *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 107, 609 *A.*2d 11 (1992). For this reason, "[m]any states have enacted legislation to control the use of drug testing in a variety of contexts." *Ibid.* As those legislatures have recognized, the sensitive task of balancing the privacy interests of employees against the legitimate business interests of employers "involves policy determinations which are peculiarly within their purview." *Wilkinson v. Times Mirror Corp.*, 215 *Cal. App.*3d 1034, 264 *Cal.Rptr.* 194 (1989).

In the absence of legislative action, the executive branch of State government could provide guidance in developing a drug-testing policy for State employees. In 1989, for example, a cabinet task force addressed the issue of drug testing. The task force, which was chaired by the Attorney General, divided on whether such a policy should apply to all applicants for State employment or only to those in "[s]ensitive" positions. *Proposed Drug Testing Policy and Report of the Cabinet Task Force on Drug Testing in the Workplace* 69 (1989). Some departments supported a policy that would require testing all applicants. *Ibid.* The majority, however, thought that testing all applicants "would be administratively burdensome and cost prohibitive." *Ibid.* It further stated that most applicants could be observed during a "working test period" to see if they exhibited signs of drug use or inefficiency in performing their new jobs. *Ibid.* Consequently, the proposed policy recommended testing applicants for State employment in "[s]ensitive" positions only. *Id.* at 15. That difference of opinion among the departments of State government demonstrates the sensitivity of the issue and highlights the wisdom of permitting other branches and levels of government to develop drug-testing policies without the constraint of an unnecessary constitutional

adjudication. Any such policies, of course, would be subject to constitutional constraints and judicial review.

### -III-

To summarize, PVWC refused to hire O'Keefe as a water-meter reader for reasons unrelated to his decision not to submit to the drug test. As the Appellate Division recognized, O'Keefe's constitutional challenges to PVWC's drug-testing policy are moot. The lower courts need not have adjudicated the constitutional issues. We affirm the Appellate Division's judgment that independent of O'Keefe's refusal to submit to the drug test, PVWC had sufficient reasons to deny him employment.

As modified, the judgment of the Appellate Division is affirmed.

For affirmance—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.