253 N.J. Super. 569 (1992)
602 A.2d 760
WILLIAM M. O'KEEFE, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
PASSAIC VALLEY WATER COMMISSION, DEFENDANT-APPELLANT/CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1991.
Decided February 7, 1992.
*571 Before Judges PRESSLER, SHEBELL and D'ANNUNZIO.
Harold Goldman argued the cause for appellant/cross-respondent (William Rosenberg, attorney; Harold Goldman, of counsel and on the brief and reply brief).
Paul Schachter argued the cause for respondent/cross-appellant (Reinhardt & Schachter, attorneys; Paul Schachter on the brief and reply brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
Defendant Passaic Valley Water Commission (Commission) appeals from that portion of a judgment of the Chancery Division entered following a bench trial which declares that the Commission's policy of pre-employment drug testing violates the Constitutions of both the United States and the State of New Jersey. Plaintiff William M. O'Keefe cross appeals from *572 those portions of the judgment dismissing his claims for relief under both state and federal civil rights legislation, 42 U.S.C.A. § 1983, and N.J.S.A. 10:5-1 et seq.; dismissing his claims for punitive damages and attorneys fees; and determining that Commission's reasons for refusing to hire him as a water meter reader were independent of his refusal to submit to pre-employment drug testing. We affirm the judgment in its entirety substantially for the reasons stated by Judge Dwyer in his written opinion.
We first address the cross appeal since we are satisfied that if we affirm the judge's holding that plaintiff's employment application was rejected for reasons other than his refusal to submit to a pre-employment drug test and if those reasons did not implicate any other civil right to which plaintiff is entitled, then plaintiff's failure to obtain the water meter reader position for which he applied is not susceptible to any remedy.
In reviewing the record in this light, we are satisfied that Judge Dwyer's "other reasons" conclusion is entitled to our deference since it is supported by adequate credible evidence. See Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-484, 323 A.2d 495 (1974). The linchpin of the trial judge's determination was the prior rejection of plaintiff's application for the civil service position of water meter reader by its Personnel Director, John Galletta, in the summer of 1986. That was before the Commission's adoption of its pre-employment drug-testing policy. Galletta testified that following the employment interview, he chose not to offer plaintiff the available meter reader job because:
... I looked at his job history and four years or so, he changed and had many jobs, he was very flippant, in his responses. He sort of gave me the impression of being a wise-guy type person and I didn't feel that the answers to why he left certain jobs was coming out as truth.
Others were then hired.
The Commission adopted its drug-testing policy in May 1987. Plaintiff, whose civil service certification continued in effect, was shortly thereafter advised by civil service personnel that *573 there was another water meter reader position available at the Commission. He expressed his current interest to the Commission and was summoned for another interview.
During this second interview, Galletta told plaintiff about the new drug-testing policy. Plaintiff agreed to submit to the test and signed a waiver form. An appointment was made for him at the medical facility performing both pre-employment physical examinations and pre-employment drug tests. Galletta was satisfied to let the entire pre-employment procedure run its course in order to have as complete a basis as possible on which to compare job applicants. Nevertheless he "had the same impression [of plaintiff] the second time that [he] had the first time," namely, the negative impression that he was a "wiseguy" and all that that entails in the employment context.
When plaintiff presented himself at the medical center, he refused to submit to urine testing for drugs, apparently having telephoned an attorney for legal advice on that question in the interim. He had, however, not so advised Galletta. In any event, his first explanation to the center's physician was that he feared to take the test because of his concern that the medication he was taking for hepatitis from which he had previously suffered would cause a false positive result. The physician assured him that he could design the test to take that medication into account if plaintiff would tell him what it was. Plaintiff responded that he could not remember the name of the medication. It turns out that he was actually taking tranquilizers, not medication for hepatitis. In any event, the medical center called Galletta to advise him that plaintiff had refused to take the test. Galletta requested that such tests be administered as plaintiff would submit to in order that as full a file be developed. The job was later offered to and accepted by a candidate Galletta felt to be a superior employment prospect and of whom he had a "better impression."
Based on the foregoing, the trial judge found that Galletta declined to offer employment to plaintiff because of his justifiable *574 belief that plaintiff "was not truthful," was a "wise guy," and had a "disrupting behavior pattern."[1] It is true that the trial judge did note that plaintiff's refusal to take the drug test did play some part in the non-hiring decision. But as the judge explained, the non-hiring decision was not based on the refusal itself. Rather the circumstances of the refusal, including plaintiff's uncommunicated change of mind after signing the waiver and his equivocation respecting his reasons for refusing to take the exam, merely reinforced Galletta's negative impressions respecting plaintiff's attitude and trustworthiness. The judge concluded, moreover, that those impressions, which he found to be reasonable and credible, constituted a valid and independent reason for the non-hiring. We are satisfied, particularly in view of the judge's expressed appraisal of the relative testimonial credibility of plaintiff and Galletta, that these findings and conclusions are adequately supported by the record and, consequently, require our deference.
We also agree with the trial judge's reasons for rejecting plaintiff's remaining claims based on the alleged wrongful non-hiring. Since plaintiff did not establish that he was a drug addict, or was otherwise a handicapped person, or would have tested positive had he submitted to a drug test, his claim under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., is without merit. Since his non-hiring was not based on his refusal to take a pre-employment drug test, his claim under 42 U.S.C.A. § 1983 necessarily fails whether or not the drug testing was constitutionally permissible. The rejection of his claim for counsel fees under 42 U.S.C.A. § 1988 was a matter within the court's discretion, and under all the circumstances it was properly rejected. Finally, since plaintiff's non-hiring was *575 not wrongful, both the compensatory damages claim and the punitive damages claim must fail.
Since plaintiff was thus not able to demonstrate a basis for relief even if the drug-testing requirement were determined to have been unconstitutional, we are satisfied that the question of constitutionality need not have been reached at all. We address it, however, because the judgment appealed from expressly adjudicates that question. We start, as did the trial judge, with the opinions of the United States Supreme Court in Skinner v. Ry. Labor Executives Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989), and Nat'l Treasury Employees Union, et al. v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). We read these cases to hold that a government employer's taking of a urine sample from an employee in order to conduct a test for illegal drugs constitutes a search and seizure within the intendment of the Fourth Amendment. We further read these cases to hold that the government may nevertheless require drug testing without running afoul of the proscriptions of the Fourth Amendment in those circumstances in which the government's special and compelling need to protect the public safety outweighs the employee's privacy interest. It is consequently not every government employee who is subject to involuntary drug testing. See Von Raab, 489 U.S. at 672, 109 S.Ct. at 1394, 103 L.Ed.2d at 706, distinguishing "most private citizens or government employees in general" from the much narrower class of those government employees subject to drug testing because of the magnitude of the risk their workplace drug use imposes on public safety.
That class has been defined by Skinner, 489 U.S. at 628, 109 S.Ct. at 1414, 103 L.Ed.2d at 667, which dealt with drug testing of railroad workers after their involvement in an accident or other defined incident, as including those who "discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." And as further defined by Von Raab, which dealt with certain *576 customs officers, it also includes those whose own drug use might "irreparably damage" the national interest in self-protection from the illegal drug plague and those whose drug use might impair their perception in the use of the firearms they are empowered to carry. 489 U.S. at 670, 109 S.Ct. at 1393, 103 L.Ed.2d at 705. That safety-sensitive class as defined by Skinner and Von Raab has consequently been held to encompass civilian employees in military positions involving aviation, police guard and drug abuse treatment programs; prison employees having daily contact with prisoners; school bus drivers; municipal bus drivers and mechanics; public employees who open and close bridges; and municipal police and firefighters. See, respectively, e.g., Nat'l Fed'n of Fed. Employees v. Cheney, 884 F.2d 603 (D.C. Cir.1989), cert. denied, 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); McDonell v. Hunter, 809 F.2d 1302 (8th Cir.1987); Indep. School Dist. No. 1 of Tulsa County v. Logan, 789 P.2d 636 (Okla. Ct. App. 1989); Jones v. McKenzie, 833 F.2d 335 (D.C. Cir.1987), cert. granted and judgment vacated, Jenkins v. Jones, 490 U.S. 1001, 109 S.Ct. 1633, 104 L.Ed.2d 149 (1989); Int'l Fed'n of Professional & Technical Eng'rs v. Burlington County Bridge Comm'n, 240 N.J. Super. 9, 572 A.2d 204 (App.Div.), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990); City of Annapolis v. United Food and Commercial Workers, 317 Md. 544, 565 A.2d 672 (1989). But see Fr. Order of Police v. City of Newark, 216 N.J. Super. 461, 524 A.2d 430 (App.Div. 1987), holding that involuntary drug testing of police officers without individualized suspicion violates the state constitutional provision, N.J. Const. art. I, par. 7, prohibiting unreasonable searches and seizures. And see also Guiney v. Police Comm'r of Boston, 411 Mass. 328, 582 N.E.2d 523 (1991) requiring individualized suspicion for drug testing of police officers.
While an adequate nexus between the nature of the employment and the risk to the public safety by reason of the employee's impaired judgment due to drug use will thus sustain involuntary drug testing by a governmental employer, it is also *577 clear that the mere desiderata of a drug-free workplace and the general stability and integrity of the work force do not provide the requisite nexus. See, e.g., Harmon v. Thornburgh, 878 F.2d 484 (D.C. Cir.1989), cert. denied sub nom. Bell v. Thornburgh, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990); Taylor v. O'Grady, 888 F.2d 1189, 1196 (7th Cir.1989).[2]See also Patchogue-Medford Teachers Congress v. Bd. of Educ., 510 N.E.2d 325 (N.Y. 1987), holding that public school teachers are not subject to drug testing, even during the course of their annual physical examinations, absent individualized suspicion. And see Harmon, supra, so holding in respect of Justice Department attorneys.
Do water meter readers, even water meter readers who must enter customers' homes in order to read the meter, meet the public-safety nexus test articulated by Von Raab and Skinner? We are convinced that the record before us cannot support an affirmative answer. At the outset, we are constrained to reject the analysis of the dissent respecting crime prevention. We pass the question of the propriety of an appellate court relying on sociological materials, particularly surveys, which were not part of the trial record and whose methodology and reliability were never tested. We also note that the judicial literature on the drug-testing issue is framed in terms of the safety risk by reason of the impaired perception of drug users, not on the finding or even the speculation that drug-using employees will commit criminal acts on the job. Beyond that, the fact is ineluctable on this record that crime prevention was not any part of the reason for the Commission's pre-employment drug-testing requirement.
It is certainly significant that the Commission's drug-testing policy does not include those already employed, including currently *578 employed meter readers, but is limited to job applicants only. Obviously if the public safety were significantly threatened by a positive-testing meter reader, the Commission could hardly justify the exclusion of currently employed meter readers from a testing protocol. But more significantly, Galletta's testimony convincingly demonstrated that the Commission's express reason for its adoption of the drug-testing policy in 1987 was not crime avoidance at all. Indeed Galletta made it quite clear that there has never been a criminal incident involving an on-the-job meter reader. There have, however, in the past, been several criminal episodes traced to employee drug use involving other Commission employees, including one minor embezzlement, one minor theft, and an incident in which an employee overdosed in the men's room, requiring emergency assistance. The record does not indicate if there have ever been any criminal episodes not involving drug use or how many drug-using employees there are who have never been involved in job-related crime. But in any event, this record fails to support any nexus at all between positive drug testing and the risk of meter reader criminality on the job.
On the other hand, Galletta's testimony demonstrates that the Commission's reason for adopting the drug-testing policy was its desire to avoid employee absenteeism and health costs resulting from drug abuse as well as its general desire for the benefits of a drug-free workplace and a stable work force. These are laudable purposes. The problem, however, is that they have been held not to be of sufficient magnitude to overcome the Fourth Amendment protection of the current work force. See Harmon, supra.
Since we are satisfied, at least on this record, that under the circumstances here, those currently employed by the Commission are not constitutionally subject to drug testing absent individualized suspicion, the next question is whether a job applicant may be disparately treated in this respect. Our view is that if involuntary drug testing of meter readers is constitutionally interdicted, it would make no difference whether the *579 employee is actual or prospective. That is, if the nexus between the nature of the employment and public safety warrants drug testing, both employees and applicants may be tested. If it does not, than neither may be tested.
In short, it is well established that government employment may not be conditioned on the prospective employee's prior waiver of constitutional rights. See, e.g., Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811, 817 (1968). Nor can a prospective employee be deemed to have consented to drug testing by having applied for public employment. See McDonell v. Hunter, 809 F.2d 1302 (8th Cir.1987); Feliciano v. City of Cleveland, 661 F. Supp. 578 (N.D.Ohio 1987). The point, as we see it, is that the Fourth Amendment rights of a government employee are the same when he applies for employment as they are after he is employed. It is not the distinction between prospective employment and actual employment which makes a difference in Fourth Amendment terms but rather whether the nature of the employment, irrespective of whether it is sought or obtained, poses a sufficient risk to public safety to warrant drug testing. Hence we see no constitutional basis on which to treat applicants differently from employees.
We are aware that there is some difference of judicial opinion as to whether applicants for government employment may be subject to drug testing in order to obtain a job although they could not be constitutionally tested absent individualized suspicion after obtaining it. Although the majority in Willner v. Thornburgh, 928 F.2d 1185 (D.C. Cir.1991), cert. denied sub nom. Willner v. Barr, ___ U.S. ___, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991), held that that is indeed the case, we are convinced by the contrary and persuasive reasoning of the dissenter, Judge Henderson. See 928 F.2d at 1195-1196. See also Georgia Ass'n of Educators v. Harris, 749 F. Supp. 1110, 1115 (N.D.Ga. 1990), holding that applicants are entitled to the same Fourth Amendment rights as employees and noting further *580 the irrelevancy, in constitutional terms, of the private sector body of law. Compare Hennessey v. Coastal Eagle Point Oil Co., 247 N.J. Super. 297, 589 A.2d 170 (App.Div. 1991), certif. granted, 126 N.J. 340, 598 A.2d 897 (1991); Wilkinson v. Times Mirror Corp., 215 Cal. App.3d 1034, 264 Cal. Rptr. 194 (1989).
We are, of course, entirely sympathetic to the Commission's desire to obtain a stable and trustworthy work force. We do not, however, believe that drug testing is an indispensable screening device for achieving that goal. Legitimate personnel procedures including the judgment of experienced personnel directors based on interviews, job history, references, school records, and the like are available. Those procedures were used here and apparently with success.
The judgment appealed from is affirmed in its entirety.
D'ANNUNZIO, J.A.D., dissenting.
The issue is whether a public sector employer may require an applicant for employment to submit to a urine test to detect the illicit use of drugs.
Plaintiff, having passed a civil service examination, applied in 1986 to defendant, the Passaic Valley Water Commission (Commission), for employment as a meter reader. Although the Commission's personnel director, John Galletta, interviewed plaintiff in the fall of 1986, the Commission did not offer him a position. In the spring of 1987, plaintiff received a notice through civil service of another opening in the position of meter reader. He applied and was interviewed by Galletta and by the department supervisor. Thereafter, a secretary in the Commission's personnel office contacted plaintiff and asked him to come to the personnel office to complete some forms, a stage in the job application process plaintiff had not reached in 1986. Significantly, the forms included an IRS W-4 and enrollment in the Commission's employee benefit programs including its prescription, *581 vision care, dental care, health benefits and life insurance programs.
One of the forms was a consent to a pre-employment drug test. The test was to be administered as part of a pre-employment medical examination. The drug test consent form stated:
RELEASE
It is the policy of the Passaic Valley Water Commission to have all new employees submit to a drug test as part of their application for employment with the Commission.
I understand that as part of my pre-employment application with Passaic Valley Water Commission I will have to undergo a drug test at no cost or obligation to me by a doctor employed by the Commission.
I hereby agree that the taking of this drug test is voluntary on my part and that the results will remain confidential between the doctor, the Commission and myself.
I further understand and agree that should the results of said test prove positive, my application for employment with the Commission may be rejected. Notwithstanding the above, I hereby agree to submit to said drug test voluntarily and of my own free will.
Plaintiff filled out the various forms including the drug test consent form, and the secretary made an appointment with the Niccollai Medical Center for plaintiff's pre-employment examination. Upon his arrival at the medical center, plaintiff was asked to submit two urine samples, one for drug testing and the other for non-drug medical tests. He refused to submit to the drug test. Plaintiff explained to the examining physician that he was taking medication due to a hepatitis infection and was "concerned about a false positive or reaction." The physician explained that if plaintiff would provide him with the name of the medication, he would "rule them out." Plaintiff testified that he also refused to submit to the test because "given my background, I felt there was no reason that I should even be suspected as a drug abuser." He submitted to the medical examination, but without the drug test.
The Commission did not hire plaintiff. Rather, a wall of silence enveloped the Commission regarding plaintiff's status. *582 Despite having gone through the trouble and expense of a medical examination as well as execution of the paperwork usually associated with employment, the Commission never informed plaintiff that someone else had been given the job or that he had been rejected. Plaintiff's attempts to contact Galletta and to determine his status were unsuccessful.
Plaintiff filed this complaint in May, 1988. He alleged that the Commission's policy of requiring a drug test of all applicants violated the prohibitions against unreasonable searches and seizures found in the United States and New Jersey constitutions and that his rejection for refusing to submit to an unconstitutional test also violated those constitutional guarantees. Plaintiff alleged a cause of action under 42 U.S.C.A. § 1983. He sought appointment to the position of meter reader, backpay, compensatory and punitive damages, counsel fees and an order "permanently enjoining defendant from requiring any applicant for employment or employee to submit to a urinalysis for drug testing in the absence of obtaining a warrant or having probable cause to believe that said individual is under the influence of unlawful drugs."
Plaintiff's complaint also alleged that drug abuse "is a medically demonstrable condition which constitutes a handicap under the New Jersey Law Against Discrimination," N.J.S.A. 10:5-4.1, and charged defendant with violating that statute through "tests and criteria which have the effect of screening out handicapped individuals ... without regard to whether the nature and extent of the handicap reasonable [sic] precludes the performance of the particular employment." Prior to trial, the court granted defendant summary judgment on this count.
After a bench trial, the court entered a judgment based on findings and conclusions expressed in a 107-page written opinion. The court determined that the Commission's pre-employment drug testing violated the search and seizure clauses of the constitutions of the United States and the State of New Jersey. However, the trial court also determined that plaintiff "would *583 not have been hired by defendant independent of his refusal to submit to the pre-employment drug test." Based on this finding, the court ruled that plaintiff was not entitled to damages. The court also denied his application for counsel fees.
The Commission appealed and the plaintiff filed a cross-appeal. The core issue is the constitutionality of the Commission's drug testing policy.
Government compelled collection and testing of urine to detect the use of illicit drugs is a search subject to the requirements of the Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. Skinner v. Railway Labor Exec. Ass'n., 489 U.S. 602, 617, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639, 660 (1989); Treasury Employees v. Von Raab, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685, 701 (1989); Local 194A v. Burlington Bridge Comm'n., 240 N.J. Super. 9, 572 A.2d 204 (App.Div.), certif. denied, 122 N.J. 183, 584 A.2d 244 (1990); Fraternal Order of Police v. City of Newark, 216 N.J. Super. 461, 524 A.2d 430 (App.Div. 1987).
In Skinner, the Supreme Court rejected a Fourth Amendment attack on regulations requiring toxicological drug testing, including the collection and testing of blood and urine, of railroad workers after certain events such as "major train accidents" or "impact accidents." In Von Raab, the Supreme Court addressed a drug testing program implemented by the United States Customs Service. Under the program, existing service employees who applied for positions directly involving the interdiction of drugs, the carrying of firearms or the handling of classified material were subject to urinalysis for drug screening after meeting all other job criteria. The Court upheld the testing of employees seeking promotion to positions requiring the carrying of firearms or directly involving drug interdictions. As to positions involving "classified material" the Court deemed the record insufficient and remanded for further proceedings to clarify the requirement's scope.
*584 In Skinner the Court noted that not all searches are proscribed by the Fourth Amendment, "only those that are unreasonable," Skinner, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661, and that "the permissibility of a particular practice `is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" Id., quoting Delaware v. Prouse, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667-668. Thus, if the government has special needs beyond its interest in law enforcement, courts must "balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements in the particular context." Id. This principle has been applied in Hartness v. Bush, 919 F.2d 170 (D.C. Cir.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2890, 115 L.Ed.2d 1055 (1991); National Federation of Federal Employers v. Cheney, 884 F.2d 603 (D.C. Cir.1989), cert. denied, 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990); and Harmon v. Thornburgh, 878 F.2d 484 (D.C. Cir.1989), cert. denied, 493 U.S. 1056, 110 S.Ct. 865, 107 L.Ed.2d 949 (1990).
In the present case I identify two distinct categories of governmental need. Each satisfies the requirement of a special governmental need beyond law enforcement.
At first blush the position of water meter reader does not require qualifications beyond the ability to read and record numbers. There is no apparent potential for an aberrant meter reader to do substantial damage to the employer's property or processes, or to the environment. Cf. Hennessey v. Coastal Eagle Point Oil Co., 247 N.J. Super. 297, 589 A.2d 170 (App. Div.), certif. granted, 126 N.J. 340, 598 A.2d 897 (1991) (oil refinery employee). The record, however, establishes the Commission's special need, for the protection of its customers, to be highly selective in the employment of meter readers. Indeed, it may have a legal duty to be selective. Cf. DiCosala v. Kay, 91 N.J. 159, 450 A.2d 508 (1982) (recognizing the tort of negligent *585 hiring). But cf. N.J.S.A. 59:2-10 (public entity is not liable for public employee's criminal acts or wilful misconduct).
The record establishes that to read a meter the reader must enter the customers' houses. According to Galletta, 90% of the meters are in the customers' basements. Access to the basements is through outside doors leading directly to the basements (and by implication affording access to other parts of the house) or, in the absence of outside doors, access is through the living areas of the houses. For customers who are not at home during business hours, access is achieved using house keys that the trusting customer has deposited with the Commission for that purpose. A reader reads 80 to 120 meters per day. Consequently, it is not surprising that Galletta testified that qualities he looks for in meter reader applicants are stability and trustworthiness. Galletta also testified that another important factor is "attitude in the interview, because he is out there working with or talking to possibly 80 to 100 customers every day."
Social scientists have been studying drug use and criminal behavior for decades to establish or disprove a linkage between them. See generally, 5 SAGE Annual Review of Drug and Alcohol Abuse, The Drugs  Crime Connection (James A. Inciardi ed., 1981) (hereafter Inciardi); Academy of Criminal Justice Sciences, Drugs, Crime and the Criminal Justice System (Ralph Weisheit ed., 1990) (hereafter Weisheit); and the references and bibliographies contained in each. The position that drug usage leads to other forms of criminal behavior receives support in statistics published by the United States Department of Justice. The department reports that "75% of jail inmates ... had used drugs at some point in their lives" and that "a third of State prisoners, a quarter of convicted jail inmates, and two-fifths of the incarcerated youth said they had been under the influence of an illegal drug at the time of their offense." United States Department of Justice, Drugs and Crime Facts, 1989 5 (1990). According to this report:

*586 Among State prisoners 
 drug offenders and burglars were the most likely to have been under the influence of drugs at the time of their offense
 19% had used a major drug (heroin, cocaine, PCP, or LSD) daily in the month before the offense for which they were imprisoned, and 70% of these (13% of all inmates) were convicted of a crime for gain (including robbery, burglary, drug trafficking, and larceny)
 half of those sentenced for robbery, burglary, larceny, or a drug offense were daily drug users, and about 40% were under the influence of an illegal drug when they committed the crime  a higher proportion than for inmates convicted of other crimes
 male inmates were somewhat more likely than female inmates to use drugs  the proportion of inmates who used heroin was somewhat greater among women than men.
The convicted jail inmates most likely to have used drugs just prior to the offense were drug offenders and property offenders.
Id. at 6. Regardless of the dramatic nature of those numbers, they don't answer the "chicken-egg inquiry: Which came first in the offender's career, crime or drugs?" Inciardi, supra, at 7. Therefore, they do not satisfactorily establish that drug use leads to other types of criminal behavior. Moreover, at least one commentator warns us to beware of hyperbole, misconception and distortion allegedly foisted upon a gullible public by the drug enforcement bureaucracy. Duane C. McBride and James A. Swartz, Drugs and Violence in the Age of Crack Cocaine, in Weisheit, supra, at 142-45 (hereafter, McBride).
Nevertheless, social scientists who warn of bureaucratic hyperbole recognize a legitimate concern regarding drug use and violence.
Thus, while the use of cocaine makes individuals feel alert and aggressive, rapid in their perceptions and action, on top of the world and invincible, it also induces alternative feelings of depression irritability, suspicion and paranoia. The combination of suspiciousness, paranoia, and a feeling of aggressive invulnerability, can certainly result in the tendency to define situations or interactions as threatening, to be willing to be aggressive in those situations and to feel that the aggressive confrontation can be won. The identification of cocaine in a large number of autopsies of Miami homicide victims (McBride et al., 1986), and the multiple wounds to those individuals, suggests that cocaine use may have operated on both sides of the equation. The murderer may have been under the influence of cocaine at the time the act was committed and was thus driven towards committing a particularly brutal murder. The victim, possibly feeling *587 a sense of invulnerability, may have miscalculated the risk that was being taken in the encounter.
In and of themselves, violent acts are complex behavioral phenomena that are most likely caused by a confluence of factors: cultural, situational and dispositional. It is, therefore, difficult to tease out the specific impact made by a given drug's psychopharmacology. Drug use does not occur in a vacuum. But, for heuristic purposes, it may be worth conjecturing that it is the interaction of the psychopharmacological effects induced by chronic cocaine use with a milieu that encourages suspicion and aggressiveness that synergistically potentiates such a high degree of violent behavior. The seamless meshing of the psychopharmacology of crack cocaine with an environment that is partially produced by and that, in turn, enhances these effects, may be an element unique to cocaine and to present conditions on the street, compared to previous times.
McBride, supra, at 156-157. The authors also concede that "[m]any users of crack cocaine, including dealers, undoubtedly commit many crimes (some violent) to support their habits." Id. at 159.
Carl D. Chambers et al., Criminal Involvement of Minority Group Addicts, in Inciardi, supra, at 125, reports a consensus among "most researchers" that:
(1) The criminal involvements of narcotic addicts are extensive and varied, and most of their crimes go unreported and/or unsolved (see Inciardi and Chambers, 1972).
(2) The criminal involvements of narcotic addicts are greater than their criminal involvements prior to the onset of addiction, and they are more involved than criminals who are not addicted (see Chambers, 1974; Cushman, 1974; File et al., 1974; Plair and Jackson, 1970; Weissman et al., 1974).
(3) In order to place the criminal involvements of narcotic addicts in an appropriate perspective, one must control for the race, sex, and age of addicts (see Ball, 1970; Ball and Lau, 1970; Chambers and Moffett, 1970; Chambers et al., 1970a., 1970b; File et al., 1974; James, 1976).
(4) Although the mainstays of the narcotic addict's crime repertoire are still property crimes, vice crimes, and selling drugs to other addicts, addicts have become increasingly involved in the commission of crimes against persons when these "personal" crimes produce an immediate financial return (see Chambers, 1974; Greenberg and Adler, 1974; Inciardi and Chambers, 1972; Preble and Casey, 1969; Weissman et al., 1974).
(5) The specific criminal involvements of narcotic addicts probably vary by both time and place (see Ball, 1970; U.S. Bureau of Narcotics and Dangerous Drugs, 1971).
Withdrawal from the use of narcotics may also contribute to aggressive, confrontational behavior. "[T]he withdrawal period... is anything but sedate and is punctuated by discomfort, *588 irritability, and a strong craving to get a `fix.' It is during this time of drug withdrawal that the direct physiological effects of the drug may induce the addict to commit a violent act." McBride, supra, at 149.
I conclude that studies of the relationship between drug use and criminal activity provide a reasonable basis for legitimate concern among public employers regarding drug usage by their employees independent of the general need for law enforcement. That legitimate concern translates, in the present case, to a special need to screen drug users from the meter reader position because of the meter reader's special access to the homes and buildings of the Commission's customers. The meter reader's access provides a rich environment for property crimes such as theft as well as opportunities for personal confrontations with customers. In this context, the Commission has a high duty to reciprocate its customers' trust by minimizing risk to the customers and their property from antisocial behavior of meter readers it hires.
Crime, however, is not the Commission's only legitimate concern. The principal objective of the job application process, from the employer's point of view, is the prediction of the applicant's job performance. An employer reasonably may conclude that drug usage establishes an unacceptable risk of poor performance. In a study of 2,537 applicants who were offered and accepted employment as postal workers, the subjects were evaluated for job performance over 406 calendar days. As part of the job application process, each subject had provided a urine sample which was tested for evidence of marijuana and cocaine use.[1] Those who tested positive were compared with those who tested negative. The job performance characteristics being evaluated were: turnover, absenteeism, *589 time to first work-related accident, time to first work-related injury and time to first report of disciplinary action.
Seven and eight-tenths percent (7.8%) of the subjects tested positive for cannabinoids in their urine, 2.2% showed cocaine metabolites and 2.2% showed other drugs. The researchers concluded that those with marijuana-positive urine samples had 55% more industrial accidents, 85% more injuries and a 78% increase in absenteeism. For those with cocaine-positive urine samples, there was a 145% increase in absenteeism and an 85% increase in injuries. Craig Zwerling, et al. The Efficiency of Preemployment Drug Screening For Marijuana and Cocaine in Predicting Employment Outcome. 264 JAMA 2639, 2643 (1990) (hereafter Zwerling).
According to the authors, the study suggests that many of the claims cited by others to justify preemployment drug screening have been exaggerated, including claims that drug users "have been reported to be involved in 200% to 300% more industrial accidents, to sustain 400% more compensable injuries, and to use 1500% more sick leave." Zwerling, supra, at 2643.[2]
I do not suggest that the Zwerling study is the last word on the subject[3] or justifies the conclusion that one positive urine test is an infallible predictor of job performance. Indeed, because the Zwerling study relied on one positive urine test, its sample included the occasional drug user as well as the chronic abuser. I am satisfied, however, that there is currently enough *590 support in social research to justify and legitimize a public employer's concern that an applicant who uses illicit drugs will more likely be a problematic employee than a drug free applicant.
That concern motivated the Commission to initiate its drug screening program in 1987. Although the Commission could not identify drug related problems among its meter readers, a fact that may reflect the care with which readers are selected, it did have problems with employees in other departments. Galletta testified that the Commission became concerned about excessive absenteeism. According to Galletta, some of the long term absences involved employees who were undergoing drug rehabilitation. In addition, Galletta also testified that an employee known to be a drug abuser converted to his own use a customer's deposit for installation of service. Another drug using employee took money from a customer's kitchen table. Galletta also related that "one of our employees was incarcerated for criminal robbery due to his drug abuse." According to Galletta, four or five employees questioned about their absenteeism admitted to drug problems and requested rehabilitation programs. Lastly, Galletta stated that he had received several requests by employees for transfers because of alleged drug use by some of their crew members.
I conclude that identification of drug users at the job application stage is a special need within the Skinner-Von Raab analysis. At that stage it is critical for the prospective public employer to develop as much relevant information about an applicant as is reasonably possible and not otherwise prohibited. The goal is to discover and eliminate applicants who pose an identifiable risk of becoming problematic employees. Objective testing, whether it is intellectual, psychological or physical testing, is extremely important to the employer because, in the great majority of cases, the applicant is a stranger, one with whom the employer has little or no experience. Cf. Von Raab, supra, 489 U.S. at 674, 109 S.Ct. at 1395, 103 L.Ed.2d at 707 ("Detecting drug impairment on the part of employees can be a *591 difficult task, especially where ... it is not feasible to subject employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments."). Interdiction of the potentially problematic applicant before he becomes a public employee is vital and in the public interest because of the risk of poor job performance and because the employment relationship imposes on the employer a bundle of obligations vis-a-vis the employee.
The employer must provide treatment for job-related injuries and illnesses and must compensate the employee for job-related temporary and permanent disability. N.J.S.A. 34:15-1 et seq. The employer also provides health benefits. Public employees who become disabled are, under certain circumstances, entitled to disability pensions payable out of taxpayer provided funds. N.J.S.A. 43:15A-42 to 46.[4] Most significantly, terminating public employees who are protected by civil service statutes or collective bargaining agreements is difficult and frequently involves protracted litigation at substantial public expense. Thus, once employed, if the risk of poor performance is realized, termination of the employee, if accomplished at all, may be a drawn out, expensive exercise. See the Civil Service Act, N.J.S.A. 11A:1-1 et seq., especially N.J.S.A. 11A:2-6 to 22; New Jersey Department of Corrections v. Torres, 164 N.J. Super. 421, 396 A.2d 1150 (App.Div. 1978), aff'd, 81 N.J. 571, 410 A.2d 686 (1980); Henry v. Rahway State Prison, 81 N.J. 571, 410 A.2d 686 (1980).
Recently, in Willner v. Thornburgh, 928 F.2d 1185 (D.C. Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 669, 116 L.Ed.2d 760 (1991), the Court of Appeals, one judge dissenting, upheld urine testing of job applicants by the Justice Department. The majority recognized a distinction of constitutional significance between a job applicant and an existing employee. The testing *592 program was upheld under the Von Raab standard because the majority determined that the job application process, by definition, was an intrusive search by the employer for needed information and involved a lesser expectation of privacy by the job applicant. See also Wilkinson v. Times Mirror Corp., 215 Cal. App.3d 1034, 264 Cal. Rptr. 194 (1989) (preemployment drug testing does not violate California's constitutional right of privacy; employer has a legitimate interest in a drug-free work environment). But see Georgia Ass'n of Educators v. Harris, 749 F. Supp. 1110 (N.D.Ga. 1990) (statute authorizing pre-employment drug testing unconstitutional).
I recognize, as the Willner majority recognized, that Von Raab involved applications by existing employees for open positions in the customs service. The reader will recall that in Von Raab the Supreme Court ruled that drug testing was constitutionally valid only with regard to certain open positions but not as to others. As previously indicated, I conclude that an important distinction between a job applicant and an incumbent employee, even one who requests a transfer to another position, is that the applicant is a stranger whereas the existing employee has a track record by which the employer can make judgments regarding fitness or the need for additional information.
I disagree, however, with the Willner majority's attempt to justify applicant testing on the ground that "[n]o one is compelled to seek a job at the Department of Justice," 928 F.2d at 1190, i.e., the job applicant is a volunteer who can avoid the test by not applying for the job. In my view, this rationale is weak and is refuted in part by other rationales utilized by the Willner majority to uphold applicant testing.
Employment is necessary to survival. In many cases it may be as economically unfeasible for a job applicant to refuse a drug test as it is for an employee to terminate employment rather than submit to such a test. Moreover, the Willner majority relied on the widespread use of job-applicant drug *593 testing in the private sector to find a diminished expectation of privacy among seekers of employment.[5] Thus, as applicant testing becomes the norm, the applicant's options become narrower. In this respect, Willner's "volunteer" justification becomes self-refuting.
To recapitulate, I conclude that special governmental need exists in two independent respects: (1) the nature of the meter reader's job, involving access to customers' homes; (2) the need of a prospective public employer to develop information about an applicant before it permits him to join its family of employees and before it undertakes the obligations of an employer vis-a-vis the applicant.
Having determined the existence of special governmental needs, the next step is to "balance the governmental and privacy interests to assess the practicality of the warrant and probable cause requirements." Skinner, 489 U.S. at 619, 109 S.Ct. at 1414, 103 L.Ed.2d at 661. I have identified and defined the government's interest. I agree with the Willner majority that a job applicant has a diminished expectation of privacy because the process is a two-way search for information. As Willner reminds us, the prospective employer is entitled to and seeks information from the applicant, his previous employers and other references on a variety of subjects. Moreover, preemployment medical examinations, including urinalysis, are common.
As urinalysis is ordinarily a part of any routine physical examination, plaintiffs and any other applicant for private employment should reasonably also have anticipated that diagnostic test as part of the examination. Thus subjecting urine samples to analysis for alcohol and drugs is only slightly more intrusive than the procedures which plaintiffs already reasonably had to expect as job seekers with private business.
*594 Wilkinson, supra, 215 Cal. App.3d at 1049, 264 Cal. Rptr. at 204. Indeed, in the present case, plaintiff did not object to a pre-employment medical examination and did not object to a urine test designed to yield information regarding his general health. I make this observation to demonstrate even plaintiff's subjective diminished expectation of privacy in the application process.
Insistence on the requirements of probable cause and a judicially issued warrant are impractical. Given the applicant's status as a stranger to the employer and defining the application process as a quest for information, it would indeed be anomalous to require the prospective employer to provide the information it is seeking as a prerequisite to its right to get it. Moreover, if probable cause and a warrant are required to test an applicant's urine for drugs, they would also be required to test urine for evidence of infectious or debilitating diseases, since the Skinner and Von Raab rulings that the collection and testing of urine is a search under the Fourth Amendment were based on the personal intrusiveness of urine collection and on the capacity of urinalysis to yield important information about a variety of the subject's health and biological characteristics, not merely on its capacity to demonstrate drug use. It appears, therefore, that a pre-employment x-ray and EKG would also be searches under Skinner.
I conclude that the Commission's testing of a job-applicant's urine for evidence of illicit drug use does not violate constitutional guarantees against unreasonable searches and seizures, and, therefore, the Commission would not have violated plaintiff's constitutional rights if it refused to hire him because he did not submit to the test.
Accordingly, plaintiff's cross-appeal from paragraph three of the judgment determining that he "would not have been hired by defendant independent of his refusal to submit to the pre-employment drug test" is moot. However, the majority addressed the issue in light of its conclusion that the Commission's *595 drug testing program violates constitutional principles. Consequently, I make the following observations regarding paragraph three. It is not consistent with the trial judge's findings. In his written opinion, the judge stated that "the court finds that O'Keefe's failure to take the drug test was a factor in Galletta's decision not to recommend him." The court also stated that "O'Keefe's execution of the release without question and then changing his position, the court finds reinforced Galletta's earlier determination that O'Keefe was a wise guy." According to the trial judge, Galletta decided not to recommend plaintiff because plaintiff's refusal to submit to the drug test after he had signed the consent form caused Galletta to "conclude from this event that O'Keefe was untruthful and a person who was disruptive in relations with others." The court concluded that "Galletta did not recommend plaintiff for employment because he was not truthful and was a `wise guy.'"
If the drug test requirement were constitutionally infirm I would reverse paragraph three of the judgment in light of these findings.[6] The assertion of a validly held constitutional right may qualify the job applicant as a "wise guy" in the eyes of a prospective employer but, as the majority points out, the "wise guy," may not be denied a job on that basis. See Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).
I agree with the majority that plaintiff's cross-appeal from paragraph two of the judgment dismissing his claim based on the New Jersey Law Against Discrimination is without merit. Plaintiff did not establish that he was an addict or was otherwise *596 a handicapped person or would have tested positive had he submitted to the test. He had no standing to assert the discrimination claim.
A determination that defendant did not violate plaintiff's constitutional rights supports the trial court's denial of plaintiff's demand for counsel fees under 42 U.S.C.A. § 1988, as well as the judgment for defendant on count four which alleged a cause of action for due process violations dependent on the unconstitutionality of the drug test requirement.
The trial court also determined that failure to use a gas chromatography/mass spectrometry test to confirm a positive immunoassay drug screening also supported his conclusion that the testing program was unconstitutional as an unreasonable search. I conclude that plaintiff had no standing to attack the reliability of the immunoassay technique. In addition, the evidence in the record does not support a finding that the immunoassay drug screen is unreliable. Plaintiff's expert did not so testify. As the trial court found, plaintiff's and defendant's experts testified that a confirmatory gas chromatography test was desirable because of the possibility of a false positive drug screen. Plaintiff's expert's testimony focused on the inability of any urine test to predict frequency of drug use, degree of impairment, if any, and job performance.
Certain aspects of the majority opinion require a limited response. The majority's implied criticism of reference to "sociological materials" is invalid. I draw no conclusion from those materials. I merely take judicial notice of the existence of studies on both sides of the issues of the relationship between drug usage, crime and job performance. The point is that the studies exist, a fact which the parties and the majority cannot deny, and demonstrate honest differences of opinion on the questions studied. Those honest differences of opinion shield public employers from attacks based on claims of arbitrary action, when their job application procedures are designed to minimize the risks inherent in employing a drug user.
*597 Moreover, concern regarding those risks is consistent with the philosophical underpinnings of the criminalization of drug use, possession and distribution: drug use results in adverse and pernicious physiological and social consequences. Those consequences were expressly noticed by the Supreme Court as the background against which it decided Von Raab. Von Raab, supra, 489 U.S. at 668-75, 109 S.Ct. at 1391-95, 103 L.Ed.2d at 704-08, and were recognized by the New Jersey Legislature in the declaration of policy and legislative findings enacted as part of the Comprehensive Drug Reform Act of 1986 (N.J.S.A. 2C:35-1 et seq.):
Despite the impressive efforts and gains of our law enforcement agencies, the unlawful use, manufacture and distribution of controlled dangerous substances continues to pose a serious and pervasive threat to the health, safety and welfare of the citizens of this State. New Jersey continues to experience an unacceptably high rate of drug-related crime, and continues to serve as a conduit for the illegal trafficking of drugs to and from other jurisdictions. In addition to the harm suffered by the victims of drug abuse and drug-related crime, the incidence of such offenses is directly related to the rate of other violent and non-violent crimes, including murder, assault, robbery, theft, burglary and organized criminal activities. For this reason, enhanced and coordinated efforts designed specifically to curtail drug-related offenses will lead inexorable to a reduction in the rate of crime generally, and is therefore decidedly in the public interest. [Emphasis added.]
N.J.S.A. 2C:35-1.1b. In light of those legislative findings, I find the majority's easy rejection of the risk of a nexus between drug use, crime and job performance to be particularly troubling. Contrary to the majority's assertion, the Commission's personnel director was concerned about drug related criminal behavior. Galletta testified that trustworthiness was a character trait he sought in job applicants and he related incidents of criminal behavior by employees involved in drug use.
In conclusion, I would reverse paragraph one of the judgment determining the testing requirement to be unconstitutional. I would reverse the paragraph three determination that "plaintiff would not have been hired by defendant independent of his refusal to submit to the pre-employment drug test." In all other respects the judgment should be affirmed.
NOTES
[1] While not relevant to Galletta's decision because Galletta was then unaware of these facts, it did appear at trial that plaintiff had been suspended for five days for insubordination while employed by another governmental agency and that he did in fact take substantial liberties with the truth in describing his previous employments and circumstances surrounding his termination therefrom.
[2] We note, moreover, that Exec. Order No. 12,564, 5 U.S.C.A. § 7301 note (1986), establishing the drug free federal workplace permits testing only of employees in "sensitive positions." See §§ 3 and 7(d).
[1] The study was blind. Neither the applicants nor the postal service was informed of the test results.
[2] Those claims were reported in:

US Office of Personnel Management, FPM letter 792.16, Establishing a Drug-Free Workplace, Federal Personnel Manual (1986).
P.B. Bensiger, Drugs in the Workplace, 4 Psychiatr Lett. 39-44 (1986).
J.D. Quayle, American Productivity: The Devastating Effect of Alcoholism and Drug Abuse. 38 AmPsychol. 454-458 (1983).
[3] Zwerling mentions an earlier study that found no relationship between drug use and job performance but criticizes it as "too small to sustain its conclusion." Zwerling at 2642. The study referred to is D.C. Parish, Relation of Preemployment Drug Testing Result to Employment Status: A One Year Follow-Up, 4 J.Gen.Intern.Med. 44, 47 (1989).
[4] A public employee who retires "on an accidental disability allowance," N.J.S.A. 43:15A-43, receives as a pension two-thirds "of his actual annual compensation." N.J.S.A. 43:15A-46 a and b.
[5] I am concerned, as is the Willner dissent, 928 F.2d at 1198- 1199, about the use of private sector behavior to establish norms for constitutional standards. However, if the private sector is permitted to test, but public employers are not, would the long-term effect be disproportionate public employment of drug users?
[6] The trial court found that plaintiff was not a credible witness. He had told Galletta and testified at trial that he voluntarily terminated his prior employment due to health reasons. The prior employer, called by defendant, testified that plaintiff had been involuntarily terminated due to absenteeism and insubordination. There is no evidence that Galletta knew that plaintiff's termination had been involuntary when Galletta decided not to recommend plaintiff for the job. Consequently, the court's credibility determination was not relevant to establish the reason he was not hired.